IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RYAN WILLIAM POTTER, as Personal Representative of the Estate of DANA LYNN MCGRANAHAN, deceased; A.P., a minor, by and through her guardian ad litem, HEATHER CRAWFORD,<br><br>Plaintiffs,<br><br>v.<br><br>NAPHCARE, INC., an Alabama corporation; KITSAP COUNTY, a political subdivision of the State of Washington; CHAD HEADLEY; KERA COVANI; ALANA SANDACK; JOHN GESE; RUSSELL CLITHERO; MARK RUFENER; JOHN and JANE DOES 1–5,<br><br>Defendants. | NO. ________________<br><br>COMPLAINT<br><br>JURY DEMANDED |

COME NOW the above-named Plaintiffs, by and through their attorney Ryan D. Dreveskracht, of Galanda Broadman, PLLC, and by way of claim allege upon personal knowledge as to themselves and their own actions, and upon information and belief upon all other matters, as follows:



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

## I. INTRODUCTION

1. On November 8, 2023, while in pretrial custody at the Kitsap County Jail, Dana Lynn McGranahan was found in her cell dead from complications caused by fentanyl intoxication and/or withdrawal. Her death was preventable and should not have occurred while she was in the custodial care of Kitsap County.

2. Opioid intoxication or withdrawal has been the third leading cause of death in jails since 2007. This fact is well known to reasonable corrections management, staff, and health care providers.

3. It is also well known that this crisis is not insurmountable. Utilizing knowledge of the factors that put inmates at an increased risk of death and needless suffering caused by opioid intoxication or withdrawal, reasonable corrections administrators formulate prevention policies that target the harms caused by opioids. If adequate policies, supervision, and training are implemented, corrections and medical staff can prevent a majority of these deaths.

4. Here, however, none of that happened. Defendant Kitsap County and its administrators and subcontractors, including Defendant NaphCare, Inc. ("NaphCare"), a billion-dollar private for-profit Alabama corporation, established and maintained inadequate practices and failed to train and supervise employees at the Kitsap County Jail. As a result, Dana died.

5. During Dana's detention at the Kitsap County Jail, there were multiple exchanges where her medical condition was known, or should have been known, and where appropriate treatment and interventions should have occurred, but did not. Defendants' acts and omissions were a tragic series of events that resulted in Dana's death.

## II. PARTIES

### A. PLAINTIFFS

6. RYAN WILLIAM POTTER is the Personal Representative of the Estate of DANA



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

LYNN MCGRANAHAN and the parent of A.P., Dana's minor daughter. This is an action arising from Dana's wrongful and unnecessary death and the Defendants' negligence and deliberate indifference to Dana's serious medical condition. The claims herein include all claims for damages available under Washington and federal law to Dana, her Estate, and all statutory and actual beneficiaries.

7. Plaintiff A.P., a minor, is Dana's daughter. She brings suit in her personal capacity by and through her guardian ad litem, Heather Crawford, and is entitled to damages for the loss of her mother.

**B. KITSAP COUNTY DEFENDANTS**

8. Defendant KITSAP COUNTY is a municipal corporation responsible for administering the Kitsap County Jail ("Jail"). The Jail is an adult corrections facility that is required to provide proper custody, control, and supervision for county, state, and federal inmates in Kitsap County. Kitsap County is, and was at all times mentioned herein, responsible for the actions or inactions, and the policies, procedures, practices, and customs of all health services relating to the Jail. Although it contracted with NaphCare to provide medical and mental health care in the Jail, it cannot contract away its constitutional obligations and is liable for the negligence and constitutional violations committed by such providers.

9. Kitsap County has promised to provide the community with "a safe, secure, legal, and respectful environment for officers, staff, inmates, professional personnel, and the community." It has made a "commitment" to provide incarcerated individuals with medical and mental health services and Medication-Assisted Treatment ("MAT") for those addicted to opioids. Through its written policy, Kitsap County has also ensured that its "communications and actions are conscientious and empathetic" and that it "respect[s] and show[s] dignity to all persons, recognizing



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

that diversity enhances our community." Unfortunately, Kitsap County failed to fulfill their commitments with respect to Dana.

10. Defendant JOHN GESE, at all times material to this lawsuit, was the Kitsap County Sheriff. He supervised, administered, and managed all Kitsap County employees and corrections facilities at the time of Dana's death and was responsible for ensuring the presence and implementation of proper policies, procedures, and training. Defendant Gese was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the following individually named Kitsap Defendants. He has approved and ratified the acts and omissions of the employees and contractors described below. He is sued in his personal capacity only.

11. Defendant RUSSELL CLITHERO, at all times material to this lawsuit, was Kitsap County's Undersheriff. He supervised, administered, and managed all Kitsap County employees and corrections facilities at the time of Dana's death, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training. Defendant Clithero was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the following individually named Kitsap Defendants. He has approved and ratified the acts and omissions of the employees and contractors described below. He is sued in his personal capacity only.

12. Defendant MARK RUFENER, at all times material to this lawsuit, was Kitsap County's Chief of Corrections. He supervised, administered, and managed all Kitsap County employees and corrections facilities at the time of Dana's death, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training. Defendant Rufener was also responsible for the training, supervision, and discipline of Kitsap County employees and/or agents, including the following individually named Kitsap Defendants. Defendant Rufener was also



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

responsible for reviewing and monitoring the medical or mental health services provided in the Jail and ensuring that contractors appropriately fulfill Kitsap County's direct duty to provide for inmates' mental and physical health and safety needs. He has approved and ratified the acts and omissions of the employees and contractors described below. He is sued in his personal capacity only.

13. Defendants JOHN and JANE DOES 1–5 ("Kitsap Defendants") at all times material to this lawsuit were employees of Kitsap County and were responsible for providing for Dana's safety and security. At all times, Kitsap Defendants were agents and/or employees of Kitsap County and were responsible for keeping Dana safe and alive, leading up to and during her incarceration. At all material times, Kitsap Defendants were acting under color of state law. The actions and omissions alleged in this Complaint to have been carried out by the Kitsap Defendants were carried out by themselves, personally, and/or with their knowledge, information, consent, or approval, and in violation of their obligations under, *inter alia*, the U.S. Constitution and Washington State common law.

### C. NaphCare, Inc. Defendants

14. NaphCare is a corporation organized under the laws of the State of Alabama, licensed and doing business in the State of Washington as a foreign for-profit corporation.

15. NaphCare is in the business of providing health care services to jail and prison facilities throughout the United States, including the Kitsap County Jail. That is, instead of maintaining their own staff of doctors, nurses, and other health professionals, corrections facilities across the United States hire NaphCare as an independent contractor to undertake the day-to-day responsibilities of providing their inmates with medical and mental health care.

16. The services provided by NaphCare include physician and nursing services, dental care, mental health or psychiatric care, pharmaceuticals, utilization management, and



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

administrative support.

17. The Jail has such an arrangement with NaphCare, as do approximately 430 local, state, and federal correctional facilities across 49 states with which NaphCare has entered into fixed-cost contracts. These contracts are structured to provide an incentive to minimize the cost of care for the corrections institutions—and to maximize NaphCare's profits.

18. Kitsap County's contract with NaphCare required that the County pay over $3 million for NaphCare's services for the calendar year 2023. In return, NaphCare guaranteed that its services would comport with "applicable Standards," defined as follows:

> "Standards" means the requirement that all Health Care Services provided under the Contract **meet or exceed all recognized standards of care for the provision of health care** by qualified health care professionals in Washington state, and provided in accordance with all standards and requirements of the U.S. and State Constitutions, federal, state and local laws, Chapter 70.45 RCW, Chapter 2.21 Kitsap County Code, the American Medical Association, American Psychiatric Association, American Psychological Association, and the accreditation standards of the [American Correctional Association], [National Commission on Correctional Health Care Accreditation], and [Washington Association of Sheriffs and Police Chiefs], now in effect and as amended during the Contract term regardless as to whether such standards are specifically referred to by the County. (Emphasis added.)

19. According to Jim McLane, NaphCare's Founder, Owner, and Chairman of the Board, NaphCare is so profitable because he has implemented a nationwide policy to put up "barriers so that [inmates] do not avail themselves to unnecessary treatment," as described in more detail below.

20. NaphCare has been on notice for over a decade that its procedures, practices, and customs are deliberately indifferent to the rights and safety of inmates—having been a named defendant in over 250 lawsuits for the precise conduct described below.

21. NaphCare has a long, documented history of civil rights and medical negligence suits against it, and a body count arising from substandard medical care and neglect in many states'



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

jails and prisons, including in Washington.

22. According to a 2019 report, for example: "NaphCare regularly swoops in to take over troubled providers' contracts in the wake of scandal." This is exactly what occurred here; in the fall of 2018, Kitsap County ended its contract with Correct Care Solutions ("CCS") following a string of inmate deaths. NaphCare's takeovers are typically followed by "a spike in jail deaths," and Kitsap County was no exception. A number of inmates died in the first years of NaphCare's contract with Kitsap County due to NaphCare's failure to implement basic medical measures. NaphCare currently holds the highest death rate among corrections health care contractors.

23. In providing medical and mental health care for inmates, NaphCare acted under color of state law.

24. NaphCare is duly registered and conducts business as a health care provider in Washington state, as defined by RCW 7.70.020*,* and provided mental health services and medical care to Dana, as contracted for by Kitsap County.

25. Individually named Defendants CHAD HEADLEY, KERA COVANI, and ALANA SANDACK ("NaphCare Defendants") are employees or subcontractors of NaphCare. These NaphCare Defendants were negligent, deliberately indifferent, and acted in furtherance of an official and/or *de facto* policy or procedure of deliberate indifference. These Defendants are sued in their personal capacities only.

26. As Medical Director, Defendant Sandack was responsible for the supervision and discipline of NaphCare employees and/or agents, including the individually named NaphCare Defendants. Defendant Sandack was responsible for reviewing and monitoring the medical and mental health services provided in the Jail and ensuring that NaphCare appropriately fulfilled Kitsap County's direct duty to provide for inmates' mental and physical health and safety needs pursuant



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

to NaphCare's contract. Defendant Sandack approved and ratified the acts and omissions of the employees and contractors described herein.

## III. JURISDICTION AND VENUE

27. This action arises under Washington State's wrongful death law and the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

28. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Kitsap County is located in this District, and the events and omissions giving rise to the claims in this action occurred in this District.

29. An RCW 4.96.020 Tort Claim was properly and timely filed with Kitsap County on August 25, 2025. Over sixty calendar days have elapsed since the claim was presented.

## IV. FACTS

30. On November 7, 2023, at 12:22 a.m., Dana walked into a home located at 312 Naval Ave. in Bremerton, Washington. The occupants of the residence did not know her and called 911. When contacted by the police, she stated she was having an "alien invasion" and that the aliens "were having a baby." During the contact with police, she was found to be in possession of methamphetamine and heroin and was highly intoxicated.

31. At 12:43 a.m., Dana was charged with Unlawful Possession of a Controlled Substance and booked into the Jail.

32. Dana was housed in an isolation cell on "detox watch" in South Pod D, Room 2. In this area, inmates are housed alone in a single occupancy cell for 24 hours a day.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

33. At around 4:30 a.m., NaphCare Registered Nurse ("RN") Chad Headley completed Dana's housing assignment and placed Dana in "general population" housing, but on a "lower bunk" with "detox watch":



34. RN Headley also conducted a "physical assessment" of Dana. Dana had stage 2 hypertension, with a blood pressure of 157/91. RN Headley charted nothing else.

35. RN Headley also conducted a "receiving screening," during which Dana indicated that she had recently been withdrawing from fentanyl and that she drinks alcohol daily.

36. RN Headley also completed a Clinical Opiate Withdrawal Scale ("COWS") assessment, which resulted in a total score of 1 because Dana was experiencing slight tremors.

37. Neither RN Headley nor any NaphCare employee completed another COWS assessment for Dana, a decision made by RN Headley and NaphCare's "TechCare" electronic medical record system, which is based on a computer algorithm and not a medical professional's



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

clinical judgment. This decision violated the standard of care, which requires that COWS assessments occur at least every four hours.

38. RN Headley also completed alcohol and opiate screening. As to alcohol, Dana indicated that she drinks alcohol "5 or greater" days a week, that she experiences "seizures or hallucinations after periods of abstaining from drinking," and that she was currently experiencing "sweating related to withdrawal." As to opiates, RN Headley indicated that Dana was "currently exhibiting opiate withdrawal symptoms" and that she uses opioids "daily."

39. RN Headley also completed a Clinical Institute Withdrawal Assessment for Alcohol ("CIWA"). Dana scored a 3 on the CIWA, triggering a NaphCare requirement that (1) Dana be administered 10 mg of Diazepam, (2) she be **reassessed within six hours**, and (3) a provider be notified to review the Diazepam drug order and "consider additional change[s] in dose."

40. NaphCare's requirement that CIWAs occur every six hours is decided by NaphCare's "TechCare" electronic medical record system, not a medical professional's clinical judgment. The decision to conduct CIWAs every six hours falls far below the standard of care, which requires that CIWAs be conducted every hour.

41. At 5:41 a.m., NaphCare Nurse Practitioner ("NP") Kera Covani reviewed the charting completed by RN Headley and ordered (1) an additional 2mg prescription of Aripiprazole and (2) twice-a-day "neuro checks"—both to be administered by 8:00 a.m. that morning. Neither NP Covani nor any other NaphCare employee assessed or followed up on Dana or took any steps to ensure that Dana was being appropriately monitored and that these orders were fulfilled.

42. Because it was not required by NaphCare policy, no one created a Behavior Plan for Dana's detox protocol. Kitsap County's expectation, on the other hand, is that if new inmates are at risk for withdrawal from drugs or alcohol, NaphCare will place them on detox protocol, inform the booking officer, and a NaphCare nurse will fill out a Behavior Plan. The Behavior Plan is to be



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

signed by the sergeant on duty and scanned into the inmate's file so that correctional officers and NaphCare employees are all informed of the protocol and the inmate's needs. The Behavior Plan is understood by Kitsap County to be the only formal communication between Kitsap County staff and NaphCare staff related to the detox protocol. Yet, NaphCare uses a separate system (TechCare), not accessible to correctional officers, for medical record keeping. Because there was no Behavior Plan for Dana's detox protocol, many County staff were not made aware of Dana's increased risk and additional needs. This NaphCare custom of failing to communicate with corrections staff in a manner sufficient to ensure adequate medical care is not unique to Kitsap County. *See, e.g., Tapia v. NaphCare Inc.*, No. 22-1141, 2025 WL 2256684, at *20 (W.D. Wash. Aug. 7, 2025).

43. At 6:00 a.m., a corrections officer conducted a booking assessment. Dana indicated that she was experiencing back pain and that she was a regular fentanyl user.

44. Kitsap County corrections officers John and Jane Does 1–5 walked by Dana's cell at 7:45 a.m., 8:05 a.m., 8:32 a.m., 9:04 a.m., 9:31 a.m., 10:01 a.m., and 10:27 a.m. Consistent with Kitsap County's custom and established practice—but in violation of the U.S. Constitution—these corrections officers did not check that she was safe and alive during these interactions (by, for instance, ensuring that her chest was rising and falling while sleeping). *See, e.g., Rapp v. Kitsap County,* No. 21-5800 (W.D. Wash.), Dkt. 273, at 23–24.

45. At approximately 10:40 a.m., Kitsap County Lieutenant Genie Elton began an "inmate welfare check walkthrough" in the South D unit where Dana was housed. Lieutenant Elton looked into Dana's cell and saw that she appeared to be sleeping. In order to ensure that she was alive, she began to knock on the cell door and yell. There was no response. Lieutenant Elton did not have her keys with her, so she left the unit to go get someone else's keys. Lieutenant Elton then returned to the cell, unlocked the door, and confirmed that Dana was unresponsive.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

46. By the time she was discovered, Dana's body was "cold to the touch," her "face was grey," and lividity had set in—indicating that Dana had been deceased for *at least* 2–3 hours by the time she was found.

47. Dana was set to appear for an arraignment on December 12, 2023, at 2:30 p.m. Dana was dead long before she was convicted or had an opportunity to defend herself in court.

48. There is no record or discussion related to referring Dana to a specialized care facility or a hospital. Kitsap County's withdrawal policy, Kitsap Policy No. 504.7.1, does not even include any discussion of referring inmates to a specialized care facility, in violation of the standard of care. For example, American Correctional Association Core Jail Standard 4C-14 requires that "[s]pecific criteria are established for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center."

49. Kitsap County and NaphCare staff at the Jail regularly ignored their detox and withdrawal policies throughout Dana's incarceration and did not regularly utilize Behavior Plans or any other communication to coordinate care between NaphCare staff and correctional staff. No supervisor ever enforced these policies or took steps to ensure they were being followed in line with the standard of care. These failures amounted to deliberate indifference to inmates' medical needs, including Dana's. Experts have concluded that it would be obvious to any professional in their field that failing to adhere to or enforce appropriate detox and withdrawal policies put Dana and other inmates similarly situated at serious risk of harm and death.

50. What is worse, there was no Behavior Plan generated at all for Dana.

51. Defendant Sandack was unqualified to treat Dana's complex and overlapping disorders and, in fact, provided no treatment whatsoever.

i. Defendant Sandack is a radiologist. She had little to no experience or training in clinically interacting with patients.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

ii. Defendant Sandack was spread thin acting as "Medical Director" for three correctional facilities across the state: (1) SCORE (South Correctional Entity) Jail in Des Moines, Washington; (2) Lewis County Jail in Chehalis, Washington; and (3) Kitsap County Jail in Port Orchard, Washington. Instead of examining inmates, she relied on lower-level nurses to serve as gatekeepers and make independent assessments and treatment decisions for her, as was NaphCare's established practice.

iii. This understaffing of qualified medical professionals and requirement that lower-level staff act outside their scope of practice are well-known, examples of NaphCare's established cost-cutting practices—i.e., one of the "barriers" implemented by NaphCare.

iv. This NaphCare practice obviously creates a likelihood of harm and death to inmates. Experts who have reviewed this case have likewise concluded that such a practice exists and that the risk of serious harm or death created by it would be obvious to any medical professional exercising his or her professional judgment.

52. Again, NaphCare uses a proprietary electronic medical record software system called TechCare to record and store its medical records. According to a letter from a NaphCare attorney to Kitsap County investigators, "when a patient is placed on detox protocol, the nurse uses . . . TechCare to perform detox checks. The TechCare Detox Dashboard has an automatic programmed frequency for the timing of the next withdrawal check based on the patient's previous withdrawal assessment score." In other words, it is NaphCare's established practice to rely on TechCare instead of clinical judgment or the standard of care in Washington State to make medical decisions.

53. NaphCare conducted no investigation of the circumstances surrounding Dana's care or subsequent death. No remedial measures were taken. This lack of reflective hindsight is one of the most troubling aspects of this case and exhibits an institutional reckless disregard to the



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

substantial risk of harm to similarly situated inmates. It likewise evidences the policies and customs described herein. *Hill v. NaphCare, Inc.*, No. 23-2741, 2025 WL 1588738, at *3 (9th Cir. June 5, 2025) (citing *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997)); *Tapia*, 2025 WL 2256684, at *9 (citing *Henry*, 132 F.3d at 519).

**A. KITSAP COUNTY WAS ON NOTICE OF THE POTENTIAL HARM CAUSED BY ITS DEFICIENT POLICIES, ESTABLISHED PRACTICES, AND CUSTOMS.**

54. Inmates have a constitutional right to adequate medical care and protection from certain general harms. The purpose of adequate, direct view safety checks is to vindicate these rights and to prevent the harms protected by them. A failure to properly train staff to adequately carry out an appropriate safety check policy could—and here did—jeopardize these rights. *See, e.g.*, *Morrison v. Beltrami County*, No. 19-1107, 2022 WL 2442363, at *8 (D. Minn. July 5, 2022).

55. Dana's suffering and death were a direct result not only of Defendants' acts and/or omissions in violation of the Fourteenth Amendment as described herein, but also of constitutional violations caused by the failure of Kitsap County and Defendants Gese, Clithero, and Rufener to properly train jail staff on how to adequately conduct proper and effective safety checks that complied with the Constitution.

56. Further, Kitsap County has systematically, and in an ongoing manner, failed to properly train its correctional officers and jail staff on how to adequately conduct proper and effective safety checks that complied with Jail policy and the standard of care. This failure to train was such that Kitsap County had a *de facto* policy and procedure of not properly training its jail staff.

57. Kitsap County's failure to adequately train is evidenced by the fact that, as a matter of practice throughout Dana's entire incarceration, direct view safety checks were not conducted every thirty minutes on an irregular schedule.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

58. Individual jailers' failure to conduct any in-person checks on Dana supports the conclusion that Kitsap County employees had a practice of not following policy.

59. The fact that there was a written policy on the timing of safety checks for inmates in medical units, crisis cells, and pre-classification/special management units suggests that Kitsap County employees would have conducted in-person visual checks on detainees had they been trained to do so. It also indicates that Kitsap County knows that its safety check custom, i.e., not ensuring that an inmate is alive and well during safety checks, puts inmates at a substantial risk of serious harm or death.

60. That this failure to train would put Dana and inmates similarly situated at an increased risk of serious harm and death would also be obvious to any corrections professional exercising his or her professional judgment.

61. The acts and omissions of Defendants Kitsap County, NaphCare, Gese, Clithero, and Rufener through their policies, practices, and customs described above were a proximate cause of Dana's pain, suffering, death, and Plaintiffs' damages.

62. All of the acts and omissions taken in regard to the care and custody of Dana, as described above, were in accordance with Kitsap County's established practices and were ratified by Defendants Gese, Clithero, and Rufener.

63. By 2016, Kitsap County and Defendants Gese, Clithero, and Rufener knew that there was an established practice amongst its employees and contractors to ignore its written withdrawal policies. *See generally Boshears v. Kitsap County*, No. 16-6012 (W.D. Wash.). In 2016, the estate of a deceased inmate brought suit against Kitsap County, alleging that its lack of a MAT program and an established practice amongst its employees and contractors to ignore its written withdrawal policies caused the death of a 35-year-old woman. The case settled in 2018. Despite this knowledge,



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Kitsap County and Defendants Gese, Clithero, and Rufener chose not to introduce a MAT program or to enforce its written withdrawal policies.

64. Kitsap County had issues with contract compliance, insufficient hiring practices, and insufficient medical care with its previous contractor, CCS. Accordingly, the County was on notice that it should be on high alert with respect to future contractors. For example, in November 2017, the Kitsap County Sheriff wrote a memorandum that highlighted all of the issues present with CCS. This included, among many other things, acknowledgments that the medical contractor was not providing "fully qualified professional healthcare employees," staffing levels were insufficient, background checks of all employees were not provided to the County, inmate medical evaluations were not being recorded or performed in a timely manner, and special needs assessments were not being performed.

65. On October 28, 2021, Kitsap County was explicitly put on notice that many of the above policies, customs, and established practices put inmates at an increased risk of serious harm or death. *See, e.g.*, *Rapp*, No. 21-5800.

**B. NaphCare Was On Notice Of The Potential Harm Caused By Its Deficient Policies, Established Practices, and Customs.**

66. Multiple audits across NaphCare facilities have revealed the same deficiencies in medical care as described herein.

67. An audit in 2019 in Fulton County, Georgia, described insufficient intake screening processes, incomplete and inadequate recordkeeping, a lack of health screenings, sick call requests going unanswered, untimely responses to complaints, and a misalignment of implemented policies and practices and the contract requirements.

68. In 2018, the U.S. Department of Justice released the results of a two-year investigation that involved NaphCare and concluded that it violated mentally ill and disabled



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

prisoners' rights due to restrictive housing practices (single occupancy cells) and insufficient and untimely mental health and medical evaluations.

69. In 2017, after an alarming spike in jail deaths that followed NaphCare's takeover of health care at the Washoe County Jail in Nevada, a National Commission on Correctional Health Care ("NCCHC") audit found inadequate health care and untimely medical treatment presented a grave risk to inmates.

70. In 2016, the organization Disability Rights Washington ("DRW"), an independent protection and advocacy organization that has a federal mandate to monitor the conditions of people with disabilities, used its authority to conduct the Amplifying Voices of Inmates with Disabilities ("AVID") project, which focused on addressing disability-related concerns in Washington State jails and prisons. DRW completed the AVID project in August of 2016. The AVID project revealed that SCORE, a NaphCare-operated facility, had significant delays in health assessments and in providing medication to inmates; many inmates did not receive timely health screenings; and many inmates did not have documentation of individualized treatment plans in their health records.

71. NaphCare has been on notice because of the hundreds of civil rights lawsuits alleging virtually the same pattern—i.e., insufficient screening and intake practices, insufficient mental health care, underqualified staff acting outside their scope of practice, lack of access to qualified medical professionals or outside care, untimely treatment, failure to transfer inmates to the hospital, incomplete recordkeeping, a lack of accountability and noncompliance with contracts. Nearly all of these lawsuits settle out of court—a clever gambit designed to avoid having to admit liability. Nevertheless, the throughline of all of the cases is the same—NaphCare provides inadequate medical care as a matter of policy to cut costs and increase profits.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

72. NaphCare has been on notice because reputable news organizations have been publishing news stories on NaphCare's inadequate medical care practices for over a decade. A simple Google search unearths a significant and terrifying number of similar allegations.

73. NaphCare knows what it is doing. Despite this knowledge, NaphCare continues its bad practices. An audit conducted at the Kitsap County Jail in 2022 revealed the same deficiencies discussed herein. The October 2022 audit, conducted by Marc Stern, MD, MPH, of the University of Washington and a consultant in correctional health care, revealed that NaphCare did not sufficiently: (1) collect medical records from outside sources; (2) conduct intake screenings, including failing to allow for adequate clinical space and confidentiality, rushing through the intake process such that it is not complete, and then not having qualified mental health or medical staff reviewing evaluations; (3) treat opioid withdrawals; (4) conduct welfare checks of inmates in single occupancy cells; (5) deliver medications; (6) monitor timeliness of access to care; (7) prevent LPNs from acting outside their scope of practice—the audit specifically stated that NaphCare needs to "[i]nactivate all LPN protocols (or activities) that allow LPNs to make and act on nursing assessments"; (8) document medications and refused medications properly; (9) process admissions from booking (allowing inmates to stay in pre-classification single occupancy cells for up to 72 hours, the most critical time for health-related problems); or (10) provide responses to inmate grievances—from the audit: "[Kitsap County Jail's] grievance responses focus more on providing a legal defense than listening."

74. Just last year, NaphCare was again put on notice that its maintenance of at least three unconstitutional practices put patients at an increased risk of serious injury or even death: "(1) a custom of allowing NaphCare [LPNs] to provide care outside the scope of their licensure, (2) a custom of relying on medically untrained correctional guards to provide medical monitoring for inmates, and (3) a custom of non-communication." *Tapia*, 2025 WL 2256684, at *1. According to



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

at least one NaphCare employee, for example, LPNs are, as a matter of "regular and established customs and practices of NaphCare," directed "to independently evaluate and make medical decisions about patients," sent "to answer medical calls that require[] medical evaluations and diagnoses," and "serve as gatekeepers by deciding which patients were and were not sick enough to see a doctor." *Tapia*, No. 22-1141 (W.D. Wash. Apr. 10, 2025), Dkt. 298, at 186, 192-93. And the communication between County staff and NaphCare nursing providers is "fragmented." *Id.*

## V. CLAIMS

### A. First Cause of Action – 42 U.S.C. § 1983 – *Monell* – Defendant Kitsap County

75. The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

76. At the time Dana was detained by Kitsap County, it was clearly established in the law that the Fourteenth Amendment imposes a nondelegable duty on jails to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

77. Plaintiffs allege that Kitsap County *at least* has the following unconstitutional customs, policies, and established practices that were the moving force behind Dana's death.

a. Kitsap County's withdrawal policy does not include criteria for referring symptomatic inmates suffering from withdrawal or intoxication for more specialized care at a hospital or detoxification center. This is in contravention of well-known industry standards, such that Kitsap County was on constructive notice of the highly predictable consequence of its deficient policy. Experts have opined that the risk of harm and death was or should have been obvious to the County. This policy was also front and center in the *Rapp* litigation discussed above.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

b. Kitsap County has systematically failed to properly train its officers and staff on how to adequately conduct proper and effective safety checks that comply with Jail policy and the standard of care. As a matter of practice throughout Dana's entire incarceration, direct view safety checks were not conducted every 30 minutes on an irregular interval. That this failure to train would put Dana and other inmates similarly situated at an increased risk of serious harm and death would be obvious to any corrections professional exercising their professional judgment.

78. Here, as described above, Kitsap County and its Policymaking and Supervising Defendants, Gese, Clithero, and Rufener, knew of and callously disregarded the excessive risk to inmate health and safety caused by their inadequate formal and informal policies and established practices. These Defendants knew of this excessive risk to inmate health and safety because it was obvious and because they had notice that numerous other inmates had been injured and/or killed as a result of substantially similar or the same inadequacies in the past.

79. As a direct and proximate result of the deliberate indifference of these Defendants, as described above and in other respects as well, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and Dana's minor child has suffered the loss of familial association.

80. Defendant Kitsap County has shown reckless and callous disregard and indifference to inmates' rights and safety, as described above, and is therefore subject to an award of punitive damages to deter such conduct in the future.

## B. SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – *MONELL* – DEFENDANT NAPHCARE, INC.

81. The acts and failure to act described above and herein were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

82. At the time Dana was detained by Kitsap County, it was clearly established in the law that the Fourteenth Amendment imposes a nondelegable duty on jails, and their contractors acting under the color of state law, to provide humane conditions of confinement, including adequate medical and mental health care and to take reasonable measures to guarantee the safety of the inmates.

83. Plaintiffs have established that NaphCare *at least* has the following unconstitutional customs, policies, and established practices that were the moving force behind Dana's death. Plaintiffs' experts have opined that these policies amount to an obvious risk of inmate harm and death:

a. An established practice and policy of allowing medical staff to act outside their scope of practice and licensure, and failing to supervise lower-level medical providers. The existence of this policy is confirmed by numerous cases throughout the nation where similar allegations are asserted; the October 7, 2022, evaluation completed by Dr. Marc Stern; testimony of other NaphCare employees; and expert evaluation of the care provided to Dana. Experts have opined that the risk of harm and death caused by this policy and established practice was or should have been obvious to NaphCare.

b. An established practice and policy of conducting the entire intake screening and evaluation at a desk in an open area with no auditory or visual privacy, where there is no ability to have the patient lie down, which is necessary for an adequate examination. The existence of this policy is confirmed by video evidence of the intake area, as well as the October 7, 2022, evaluation completed by Dr. Marc Stern. NaphCare's knowledge of the risk of serious harm and death caused by its policy is confirmed by the fact that such risks would be obvious to any medical professional exercising his or her professional judgment.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

c. An established practice and policy of failing to ensure that medical staff are conducting timely and sufficient welfare checks and detox checks. Experts have opined that the risk of harm and death was or should have been obvious to NaphCare.

d. An Opioid Use Disorder Program that is limited to individuals who meet unreasonably strict criteria. And even for individuals who qualify for the program, treatment is not started immediately, but after the patient is forced to undergo opioid withdrawal and experience a risk of serious harm and death. Inmates are then forced to suffer while awaiting adequate medical care. This policy is evidenced by NaphCare's Opioid Use Disorder Program itself and, for instance, the fact that COWS and CIWAs are, by policy, conducted every 6 hours when the standard of care requires CIWA scores to be conducted every hour, and COWS scores every four hours. NaphCare's knowledge of the risk of serious harm and death caused by its policy is confirmed by the fact that such risks would be obvious to any medical professional exercising his or her professional judgment, as well as explicit notice in the form of expert reports. *See, e.g., Rapp*, Dkt. 158-6, at 10, 14 ("The standard of care is that CIWA scores should be conducted every hour. . . . The standard of care is to conduct COWS assessment every four hours and vitals should be taken at the same time.").

e. A policy of conducting medical assessments that are without value because the patient is asleep. The existence of this policy is confirmed by the assessments documented for other patients, *e.g., Rapp*, as well as the October 7, 2022, evaluation completed by Dr. Marc Stern. NaphCare's knowledge of the risk of serious harm and death caused by its policy is confirmed by (at least) expert reports in the *Rapp* litigation, Dr. Stern's evaluation, as well as the fact that such risks would be obvious to any medical professional exercising his or her professional judgment.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

f. A policy of using TechCare instead of clinical judgment of health care providers and the standard of care in Washington State. NaphCare's knowledge of the risk of serious harm and death caused by its policy is confirmed by (at least) the fact that such risks would be obvious to any medical professional exercising his or her professional judgment.

84. All of these practices above are part and parcel of an established practice and policy of reducing and disincentivizing the provision of health care services to inmates in an effort to cut costs and increase profits.

85. Here, as described above, NaphCare knew of and callously disregarded the excessive risk to inmate health and safety caused by its inadequate formal and informal policies and established practices. NaphCare knew of this excessive risk to inmate health and safety because it was obvious and because it had notice that numerous other inmates had been injured and/or killed as a result of substantially similar or the same inadequacies in the past.

86. As a direct and proximate result of the deliberate indifference of NaphCare, as described above and in other respects as well, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she was allowed to die in the Kitsap County Jail, and Dana's minor child has suffered the loss of familial association.

87. Defendant NaphCare has shown reckless and callous disregard and indifference to inmates' rights and safety, as described above, and is therefore subject to an award of punitive damages to deter such conduct in the future.

### C. THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 – SUPERVISORY LIABILITY – DEFENDANTS GESE, CLITHERO, RUFENER, AND SANDACK

88. The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

89. At the time Dana was detained by Kitsap County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

90. “Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others.” *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009). Supervisory officials may be held liable if they implement a policy so deficient that the policy “itself is a repudiation of constitutional rights” and is “the moving force of a constitutional violation.” *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

91. Here, as described above and herein, Defendants Gese, Clithero, and Rufener, each of them, made intentional decisions in their supervisory capacity with respect to the care provided to Dana which put her at substantial risk of suffering serious harm and failed to take reasonable available measures to abate that risk, even though a reasonable jailer or medical provider in the circumstances would have appreciated the high degree of risk involved. Defendants Gese, Clithero, Rufener, and Sandack, each of them, also failed to implement measures necessary to ensure inmates were receiving adequate medical care and adequate and humane housing in such a manner that their failure amounted to deliberate indifference.

i. For example, Defendants Gese, Clithero, and Rufener knew that employees and contractors were ignoring withdrawal policies, yet chose not to enforce said policies. Kitsap County’s insufficient intake and booking processes, insufficient safety checks, and



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

insufficient communication between medical and correctional staff described herein, all presented obvious risks of harm and death.

ii. Defendant Sandack also made intentional decisions in her supervisory capacity with respect to the care provided to Dana, which put her at substantial risk of suffering serious harm and failed to take reasonable available measures to abate that risk, even though a reasonable medical provider in the circumstances would have appreciated the high degree of risk involved. Defendant Sandack also failed to implement measures necessary to ensure inmates were receiving adequate medical care and adequate and humane housing in such a manner that her failure amounted to deliberate indifference. For example, despite the fact that she knew or should have known that nurses, and she herself, were acting outside of their scope of practice, she nonetheless allowed this practice, including allowing nurses to make independent decisions and judgments with respect to inmate medical care beyond their licensure. Moreover, despite the fact that Defendant Sandack knew or should have known the serious risk of injury, suffering, and death inherent to the failure of medical staff to deliver care in a timely manner at the Jail, she failed to implement measures to ensure that medical welfare checks, detox and withdrawal checks, and medication rounds were being completed at the Jail. Allowing medical providers to act outside their scope of license and failing to implement measures to ensure timely delivery of care (especially to inmates suffering from withdrawal) present obvious risks of harm and death.

92. As a direct and proximate result of the deliberate indifference of these Defendants, as described above and in other respects as well, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

93. These Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety, as described above, and are therefore subject to an award of punitive damages to deter such conduct in the future.

### D. FOURTH CAUSE OF ACTION – 42 U.S.C. § 1983 – INDIVIDUAL LIABILITY – DEFENDANTS CHAD HEADLEY AND KERA COVANI

94. The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Plaintiffs of their civil rights.

95. At the time Dana was detained by Kitsap County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates.

96. Here, as described above and herein, Defendants Headley and Covani made intentional decisions with respect to the care provided to Dana, which put her at substantial risk of suffering serious harm and failed to take reasonable available measures to abate that risk, even though a reasonable jailer or medical provider in the circumstances would have appreciated the high degree of risk involved.

97. As a direct and proximate result of the deliberate indifference of these Defendants, as described above and in other respects as well, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.

98. These Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety, as described above, and are therefore subject to an award of punitive damages to deter such conduct in the future.

### E. FIFTH CAUSE OF ACTION – NEGLIGENCE – KITSAP COUNTY

99. Persons who work in corrections institutions have a duty to care for inmates and



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

provide reasonable safety, security, and health care. This duty is an affirmative one under both Washington State and federal law because prisoners, by virtue of incarceration, are unable to care for themselves.

100. Municipalities have a long-standing *special* duty to keep inmates in health and safety. This duty requires employees and contractors to consider what is safest and most humane for the prisoners; what is most conducive to their health, well-being, and safety. As a matter of law, Washington courts have long recognized a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety. This heightened duty is derived from the special relationship between custodians and the individuals entrusted to their care. Inmates rely completely on the government to make decisions as to their safety and health care, similar to students relying on schools, guests on innkeepers, and patients on hospitals.

101. Defendant Kitsap County—through its own institutional acts and omissions, as described above and herein—breached its duty to exercise reasonable care in its provision of Dana's health, welfare, and safety.

102. As a direct and proximate result of the breaches, failures, and negligence of Defendant Kitsap County and its employees, as described above and herein, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.

### F. SIXTH CAUSE OF ACTION – NEGLIGENCE – NAPHCARE

103. NaphCare owed Dana a duty of reasonable care, breached that duty, and proximately caused Dana's death, which resulted in damages as alleged in the paragraphs above and herein.

104. Defendant NaphCare—through its own institutional acts and omissions, as described above—breached its duty to exercise reasonable care in its provision of Dana's health, welfare, and safety.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

105. As a direct and proximate result of the breaches, failures, and negligence of Defendant NaphCare and its employees, as described above and herein, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.

106. Defendant NaphCare had a duty to select its employees with reasonable care and to supervise all persons practicing medicine under its corporate name, to ensure that they complied with the standard of care, and did not put profits ahead of comprehensive patient care.

107. Defendant NaphCare breached this duty by failing to hire competent and properly trained contractors, oversee care, implement safety policies designed to prevent harm to patients, and in many more regards, as described above.

108. As a direct and proximate result of the breaches, failures, and negligence of Defendant NaphCare, as described above and in other respects as well, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.

### G. Seventh Cause of Action – Medical Negligence – NaphCare Defendants

109. As described above and in other regards as well, the NaphCare Defendants failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which they belong, in the state of Washington, acting in the same or similar circumstances.

110. NaphCare Defendants failed to exercise that degree of care, skill, and learning expected of a reasonably prudent medical professional.

111. The NaphCare Defendants' failures, described above, were a proximate cause of the injury complained of.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

112. As a result of the NaphCare Defendants' medical negligence, Dana suffered unimaginable pain, suffering, embarrassment, and terror before she died, and her minor child has suffered the loss of familial association.

## VI. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

## VII. AMENDMENTS

Plaintiffs hereby reserve the right to amend this Complaint.

## VIII. RELIEF REQUESTED

Damages have been suffered by Plaintiffs, and to the extent any state law limitations on such damages are purported to exist, they are inconsistent with the compensatory, remedial, and/or punitive purposes of federal law, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

WHEREFORE, Plaintiffs request a judgment against all Defendants:

(a) Fashioning an appropriate remedy and awarding economic and non-economic damages, including damages for pain, suffering, terror, loss of consortium, loss of familial relations, and loss of society and companionship pursuant to 42 U.S.C. §§ 1983 and 1988, in an amount to be determined at trial;

(b) Awarding punitive damages as allowed by law;

(c) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(d) Declaring Defendants jointly and severally liable;

(e) Awarding any and all applicable interest on the judgment; and

(f) Awarding such other and further relief as the Court deems just and proper.



**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Respectfully submitted this 30th day of October, 2026.

GALANDA BROADMAN, PLLC

*s/Ryan D. Dreveskracht*

Ryan D. Dreveskracht, WSBA #42593
*Attorney for Plaintiffs*
P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690
Email: ryan@galandabroadman.com